UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CITIMORTGAGE, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:10CV1784 HEA |
| 1st ADVANTAGE MORTGAGE, et al., | ) ) ) ) |
| Defendants, | ) |

# OPINION, MEMORANDUM AND ORDER

This matter is before the Court on the Illinois Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint for Lack of Personal Jurisdiction. [Doc. No. 175]. Plaintiff has filed a Response in opposition to the Motion. [Doc. No. 179]. The Illinois Defendants have filed a Reply [Doc. No. 181], and Plaintiff has filed a Sur-Reply [Doc. No. 185]. For the reasons set forth below, the Illinois Defendants' Motion is denied.

## Facts and Background[1]

At the time of the relevant events, Plaintiff CitiMortgage, Inc. ("CMI"), a New York Corporation with its principal place of business in Missouri, was in the business of purchasing, reselling, and servicing residential mortgage loans on the secondary market. Defendant 1st Advantage Mortgage, LLC ("1st Advantage"), a dissolved Illinois limited liability company, was engaged in the business of originating, sourcing, and/or reselling residential mortgage loans. Defendants Paul Lueken, Steven Gross, Courtney Gross, Mark Grego, Keith Hoffman, Gil Antokal, and Bruce Bufe (the "Illinois Defendants"), all residents of Illinois, were members of

---

[1] The recitation of facts is taken from Plaintiff's Third Amended Complaint and are taken as true for the purposes of this motion. Such recitation in no way relieves any party from the necessary proof thereof in later proceedings.

1st Advantage who owned various percentages of the company.[2] 1st Advantage began selling loans to CMI in 2004. CMI alleges that many of the loans failed to comply with various requirements of the parties' governing contracts.

On February 4, 2008, 1st Advantage entered into an Asset Purchase Agreement ("APA") with former Defendant Draper and Kramer Mortgage Corporation ("DKMC").[3] By the terms of the APA, 1st Advantage sold DKMC the ongoing business operations of 1st Advantage, including nearly all of its assets and liabilities, and DKMC continued operating the company under the "dba" of 1st Advantage Mortgage. Defendant Lueken became the President and a director of DKMC, Defendant Greco became the Chief Operating Officer, all of the members of 1st Advantage became employees DKMC,[4] nearly all of the 1st Advantage employees became DKMC employees, and nearly 70% of those who were DKMC employees prior to the transaction were terminated. The 1st Advantage office became DKMC headquarters.

Beginning in October 2008, and continuing through late 2012, CMI demanded the cure and/or repurchase of thirty loans it had purchased from 1st Advantage. Former 1st Advantage employees who were working at DKMC communicated with CMI regarding its repurchase claims, at first arguing the merits of those claims, and eventually refusing to pay the claims on the basis that 1st Advantage ceased to exist as of April 1, 2008—the first day of the month after the closing of the asset sale.

---

[2] Defendant Courtney Gross was the wife of Steven Gross and received payments related to the eventual sale of 1st Advantage as a surrogate for her husband.

[3] By Stipulation filed on May 5, 2014, CMI's claims against Defendant DKMC were dismissed. [Doc. No. 136]. CMI notes in the Third Amended Complaint: "Claims in this case against DKMC, for loans sold to CMI by DKMC and, under theories of vicarious liability, for loans sold to CMI by 1st Advantage, which were asserted in prior versions of this complaint, have been settled and are not included herein." [Doc. No. 151 at ¶ 9].

[4] Courtney Gross became an employee and was treated as an owner of 1st Advantage in lieu of her husband, Steven Gross.

On August 30, 2010, Defendant Lueken filed articles of dissolution for 1st Advantage, stating that "all debts, liabilities, and obligations of the limited liability company have been paid and discharged or that adequate provision has been made therefore." That statement was false, given that CMI had submitted 23 of the 30 repurchase claims referenced in its Third Amended Complaint before August 30, 2010. The Illinois Defendants made no provision for the repurchase of the claims that CMI had asserted, and they left 1st Advantage without any assets to pay those claims. Further, 1st Advantage failed to provide legally required written notice of the dissolution to its creditors, including CMI.

The APA established two methods through which payment to the Illinois Defendants for DKMC's acquisition of 1st Advantage business would be made over time: (i) payment to 1st Advantage of the net asset value of the 1st Advantage business that was purchased, later determined to be $2,155,917; and (ii) payment of annual profit-sharing "bonuses" directly to the Illinois Defendants as employees of DKMC which were proportionate to their ownership interests in 1st Advantage.

After the combination of the two companies, the Illinois Defendants began to receive payments of the purchase price. During 2008 through 2010, 1st Advantage received $1,145,330 of payments of the net asset value from DKMC and distributed these payments to the Illinois Defendants, including approximately half to Defendant Lueken.

After the dissolution of 1st Advantage and through October 5, 2012, DKMC paid $813,899 directly to the Illinois Defendants. These payments brought the total paid to the Illinois Defendants as of that date to $1,959,229 of the $2,155,917 net asset value owed. The Illinois Defendants subsequently received additional payments of the net asset value directly from DKMC, bring the total paid to at least $2,055,917. During the period between the sale of 1st Advantage and its dissolution, 1st Advantage also paid the Illinois Defendants $1,524,697 as

distributions of assets that were not transferred to DKMC. These assets had approximately doubled in value since the closing of the sale.

## Procedural History

CMI initiated this action on September 22, 2010, naming only DKMC, doing business as 1st Advantage, as a Defendant and alleging breach of contract. CMI added 1st Advantage as a separate Defendant in its First Amended Complaint, filed on November 9, 2011. CMI filed a Second Amended Complaint on March 12, 2013, adding allegations and claims regarding additional loans and DKMC and 1st Advantage's relationship. On July 3, 2013, CMI filed a Complaint in a separate, but related, action against DKMC and 1st Advantage in Case Number: 4:13CV1268 HEA. By Order entered on August 13, 2013, the Court consolidated the two actions. [Doc. No. 99]. By Stipulation filed on May 5, 2014, CMI's claims against Defendant DKMC were dismissed. [Doc. No. 136].

CMI filed its Third Amended Complaint—the operative pleading—on September 12, 2014, which added the Illinois Defendants. CMI added the Illinois Defendants "to allow CMI to collect any judgment the Court may award against 1st Advantage from the [Illinois] Defendants." [Doc. No. 146].

In Count I of the Third Amended Complaint, CMI alleges that Defendant 1st Advantage breached the terms of their contracts by selling CMI defective loans that did not conform to the terms of the contracts, and further breached by failing to repurchase or cure the nonconforming loans pursuant to CMI's demands. In Counts II and III, CMI alleges that the Illinois Defendants are personally under the Illinois Limited Liability Company Act and the Missouri Uniform Fraudulent Transfers Act for any judgment for breach of contract in Count I against 1st Advantage based on the manner in which 1st Advantage was dissolved and its assets were distributed.

The Illinois Defendants now move to dismiss, asserting that this Court lacks personal jurisdiction over them.

**Legal Standard**

A defendant may move to dismiss a case under Rule 12(b)(2) of the Federal Rules for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2).

A plaintiff alleging personal jurisdiction "'must state sufficient facts in the complaint to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state.'" *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 474 (8th Cir. 2012) (alteration in original) (quoting *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010)). "If the defendant controverts or denies jurisdiction, the plaintiff bears the burden of proving facts supporting personal jurisdiction." *Wells Dairy*, 607 F.3d at 518. Personal jurisdiction "must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Id.* (internal quotation marks omitted).

Although the Court may consider affidavits and other matters outside of the pleadings on a Rule 12(b)(2) motion, the pleader's burden, in the absence of an evidentiary hearing, is only to make a "minimal" prima facie showing of personal jurisdiction, and the Court "must view the evidence in the light most favorable to the [pleader] and resolve all factual conflicts in its favor in deciding whether the [pleader] has made the requisite showing." *K-V Pharm. Co. v. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011). Notwithstanding that facts are viewed in the light most favorable to the pleader, "'[t]he party seeking to establish the court's *in personam* jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 592 (8th Cir. 2011) (quoting *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003)).

The Eighth Circuit instructs courts to "approach [the] analysis of personal jurisdiction on two levels, first examining whether the exercise of jurisdiction is proper under the forum state's long-arm statute[,] [and] [i]f the activities of the non-resident defendant satisfy the statute's requirements, [to] then address whether the exercise of jurisdiction comports with due process." *Dakota Indus. v. Dakota Sportswear*, 946 F.2d 1384, 1391 (8th Cir. 1991).

"Due process requires that a defendant have certain 'minimum contacts' with the forum state for personal jurisdiction to be exercised." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012) (citing *Int'l Shoe Co. v. Washington.*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). More specifically,

> Contacts with the forum state must be sufficient that requiring a party to defend an action would not "offend traditional notions of fair play and substantial justice." [*Int'l Shoe Co.*, 326 U.S.] at 316, 66 S. Ct. 154, 90 L. Ed. 95 (internal quotation marks and citation omitted). "The 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State." *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L.Ed.2d 92 (1987) (internal citations omitted).

*Myers*, 689 F.3d at 911.

The Supreme Court has observed:

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location of litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980).

There are two ways in which the Due Process Clause may be satisfied such that minimum contacts between the defendant and the forum state are established: the first way is through general jurisdiction, and the second way is through specific jurisdiction. General jurisdiction refers to the power of a court to hear a lawsuit against a defendant who has "continuous and

systematic" contacts with the forum state, regardless of where the cause of action actually arose. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984). Here, CMI concedes that the Court cannot maintain general personal jurisdiction over the Illinois Defendants, and alleges only specific personal jurisdiction.

"Specific personal jurisdiction, unlike general jurisdiction, requires a relationship between the forum state, the cause of action, and the defendant." *Myers*, 689 F.3d at 912 (citing *Helicopteros*, 466 U.S. at 414). The Eighth Circuit has established a five-factor test to determine whether a defendant's contacts with the forum state are sufficient to establish personal jurisdiction over the defendant. These factors, from *Land–O–Nod v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983), are: (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. "[The court] must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal jurisdiction determination." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (citation omitted).

In addition to the five *Land–O–Nod* factors, the Court must consider whether the Illinois Defendants' alleged intentional acts were performed "for the very purpose of having their consequences felt in the forum state." *Dakota Indus.*, 946 F.2d at 1390–91. This is known as the "effects test," and it was first employed by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). The *Calder* effects test requires a plaintiff to make three prima facie showings in order for the Illinois Defendants' alleged acts to serve as a source of personal jurisdiction. CMI must show that the Illinois Defendants' acts (1) were intentional, (2) were uniquely or expressly aimed at Missouri, and (3) caused harm, the brunt of which was suffered—and which the Illinois Defendants knew was likely to be suffered—in Missouri. *Johnson*, 614 F.3d at 796 (internal

quotation omitted). Rather than superseding the *Land-O-Nod* five-part test for personal jurisdiction, the *Calder* effects test merely "requires the consideration of additional factors when an intentional tort is alleged." *Dakota Indus.*, 946 F.2d at 1391; *see also Johnson*, 614 F.3d at 796–97.

The Eighth Circuit has clarified that it does not adhere to a "proximate cause standard" for the required connection between the defendant's contacts with the forum and the plaintiff's cause of action. *See id.* Rather, specific jurisdiction is warranted when the defendant purposely directs its activities at the forum state and the litigation "result[s] from injuries . . . relating to [the defendant's] activities [in the forum state.]" *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008). Courts consider "the totality of the circumstances in deciding whether personal jurisdiction exists." *K-V Pharm. Co.*, 648 F.3d at 592–93.

## Discussion

The Illinois Defendants contend that this Court lacks personal jurisdiction over them and should therefore grant their Motion to Dismiss CMI's claims against them. For the reasons discussed below, the Court finds that, although it lacks personal jurisdiction over the Illinois Defendants based on their own alleged acts, the personal jurisdiction the Court has over 1st Advantage may be imputed to the Illinois Defendants under an alter ego theory. Accordingly, the Court will deny the Illinois Defendants' Motion.

**A.     Due Process**

The due process inquiry is framed within the Eighth Circuit's admonition that "[s]pecific jurisdiction is proper 'only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities.'" *Johnson*, 614 F.3d at 795 (quoting *Steinbuch*, 518 F.3d at 586 (citing *Burger King Corp.*, 471 U.S. at 472).

### 1. The Nature and Quality of the Contacts with Missouri

The first *Land–O–Nod* factor concerns the nature and quality of the Illinois Defendants' contacts with Missouri. It is undisputed that the Illinois Defendants never maintained residences, businesses, properties, offices, employees, or agents in Missouri, nor personally transacted any business in Missouri.[5]

CMI contends that the Illinois Defendants' contacts with Missouri in this case were "the consequences . . . of deliberate wrongful conduct committed with a foreseeable specific impact aimed directly and primarily, if not exclusively, at CMI, a Missouri resident." [Doc. No. 179 at 11]. Throughout CMI's response, it repeats similar assertions—with varying degrees of force—regarding the targeting of CMI through the Illinois Defendants' alleged actions. *See, e.g,. id.* at 2–3 ("Based on what we have learned to date, CMI is the only such creditor of any consequence, which makes it the specific target of the [Illinois] Defendants' fraud."), 7 ("The fraudulent transfers were aimed specifically at CMI. CMI was the primary, if not the only, target of this fraud."), 8–9 ("The fraudulent transfer of 1st advantage assets was aimed directly and, in all likelihood, exclusively at CMI in Missouri."), 10 ("CMI not only was a target of the fraud; it appears to have been the only target."). On this basis, CMI's Response attempts to distinguish *Johnson*, where the Eighth Circuit found that the effects of a nonresident defendant's allegedly defamatory internet postings were not aimed at Missouri residents in particular, but rather could have been seen anywhere in the world. CMI asserts that, in contrast to the *Johnson* defendant's actions resulting in "diffuse targeting," the Illinois Defendants' actions were uniquely directed at CMI in Missouri.

---

[5] Defendant Lueken swore in his affidavit, in pertinent part, that he had never "personally transacted any business in Missouri, except for assisting on a small number of mortgages for family members who reside there, isolated visits to Missouri for a potential branch office that was never formed, and participating in a one-day mediation in the State, none of which were on [his] personal behalf[.]" [Doc. No. 175-3 at 1]. Although greater than the other Illinois Defendants' contacts with Missouri, these are far removed from the caliber of contacts necessary to establish personal jurisdiction in the forum.

However, these assertions run contrary to those made in CMI's Third Amended Complaint, which is the operative pleading in this matter. Therein, CMI asserts, much more generally that CMI was merely one of an indeterminate number of creditors allegedly defrauded by the Illinois Defendants' actions. [*See, e.g.*, Doc. No. 151 at ¶ 88 ("1st Advantage and the [Illinois] Defendants made th[e] transfers with the actual intent to hinder, delay, or defraud *creditors, including CMI*.") (emphasis added), ¶ 89 ("The Illinois Defendants received distributions of 1st Advantage's assets that, under the Illinois Limited Liability Act, were required to have been kept in the company to pay claims of *creditors such as CMI*.") (emphasis added); *but cf. id.* at ¶ 93 ("The [Illinois] Defendants . . . transfer[red] 1st Advantage's assets with the purpose and effect of leaving 1st Advantage unable to pay a judgment against it in favor of CMI and to conceal from CMI the fact that these assets had been moved.").

CMI was required to plead "sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within [Missouri]," *Dairy Farmers*, 702 F.3d at 474, and CMI has failed to do so with regard to the nature and quality of the Illinois Defendants' contacts with Missouri. The Court, in following the requirements of the Due Process Clause and the holding of the Supreme Court in *International Shoe Co. v. Washington*, finds that "traditional notions of fair play and substantial justice" would be offended if this Court exerted personal jurisdiction over the Illinois Defendants. The Court therefore finds that, due to the nature and quality of the contacts between the parties, the Illinois Defendants could not have reasonably anticipated being haled into court in Missouri, and thus, the first *Land–O–Nod* factor weighs in favor of the Illinois Defendants.

2.   **The Quantity of Contacts**

Because CMI failed to sufficiently allege the nature and quality of the contacts between the Illinois Defendants and Missouri to confer specific jurisdiction, the numerosity of such

contacts is immaterial to the Court's analysis. CMI's argument that the Illinois Defendants had a high quantity of contacts through transferring money from 1st Advantage to themselves in quarterly "tranches"—with each transfer representing a contact—is wholly unavailing. The second *Land–O–Nod* factor weighs in favor of the Illinois Defendants.

### 3. The Relationship of the Cause of Action to the Contacts

The third *Land–O–Nod* factor focuses on the Illinois Defendants' contacts with Missouri with respect to the particular cause or causes of action asserted. *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994). "The third factor distinguishes between specific and general [personal] jurisdiction." *Myers*, 689 F.3d at 911. "[S]pecific personal jurisdiction, unlike general jurisdiction, requires a relationship between the forum, the cause of action, and the defendant." *Id.* at 912. The *Calder* effects test may be utilized in analyzing the third factor where, as here, the plaintiff alleges tortious conduct. *N.C.C. Motorsports, Inc. v. K-VA-T Food Stores, Inc.*, 975 F. Supp. 2d 993, 1003 (E.D. Mo. 2013) (citing *Johnson*, 614 F.3d at 794–96).

The *Calder* Court found that the defendants were subject to California's personal jurisdiction because the defendants' acts were intentional, the allegedly libelous article they wrote was centered on the life and career of a longstanding California resident, "and the brunt of the harm, in terms both of Plaintiff's emotional distress and the injury to her professional reputation, was suffered in California." 465 U.S. at 789. Because the defendants' acts were "expressly aimed at California," and they knew that "injury would be felt by Plaintiff in the State in which she lives and works and in which the National Enquirer has its largest circulation," the defendants were assumed to have reasonably anticipated being haled into court in the forum state. *Id.* at 789–90.

Following *Calder*, cases decided throughout this Circuit uniformly hold that in order for a defendant's tortious conduct to confer personal jurisdiction, there must be a prima facie showing

that the defendant's intentional acts were "performed for the very purpose of having their consequences felt in the forum state." *Dakota Indus.*, 946 F.2d at 1391 (internal citation omitted). *See, e.g.*, *Johnson*, 614 F.3d at 796 (no personal jurisdiction where defendant's allegedly defamatory comments were not expressly aimed at forum, and no other evidence of minimum contacts existed); *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1387 (8th Cir. 1993) (no personal jurisdiction where "focal point" of the tortious injury occurred in outside forum, even though the court agreed that effects of the harm ultimately were felt in the forum); *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992) (no personal jurisdiction where defendant had knowledge that plaintiff would be affected by intentional tort, but otherwise had no other connection with forum); *N.C.C. Motorsports*, 975 F. Supp. 2d 993 (no personal jurisdiction where non-resident defendant entered into a lease with a Missouri plaintiff to use plaintiff's copyrighted shopping cart vehicle for promotional purposes, knowingly hired a third party to build an infringing shopping cart, and then terminated the lease when the shopping cart was ready); *Express Scripts, Inc. v. Care Continuum Alliance, Inc.*, 2011 U.S. Dist. LEXIS 61157, 2011 WL 2199967, *4 (E.D. Mo. June 7, 2011) (no personal jurisdiction where defendant did not knowingly target trademark infringement at forum, and defendant had no other contacts with the forum).

Even a close examination of *Calder* reveals that the Supreme Court's finding of personal jurisdiction in that case depended on something more than the defendants' knowledge that the plaintiff would feel the brunt of the injury in her state of residence. 465 U.S. at 784–87. Other contacts between the defendants and the forum state were found in *Calder*, including the fact that the defendants made frequent trips to the forum for business, made direct phone calls to residents of the forum in furtherance of the tort, and published the defamatory article about the plaintiff in the forum, a state where the defendants' publication had its highest circulation. *Id.* All of these

facts combined evidenced the *Calder* defendants' purposeful availment of the forum and justified the court's exertion of personal jurisdiction over them.

CMI simply has not pled such facts in this case. Again, as noted, CMI asserts that it was merely one of an indeterminate number of creditors allegedly defrauded by the Illinois Defendants' actions in Illinois. [*See, e.g.*, Doc. No. 151 at ¶¶ 88, 89]. Further, beyond the fact that CMI has failed to plead sufficient facts to support a reasonable inference that the Illinois Defendants "uniquely or expressly aimed [their actions] at Missouri," *Johnson*, 614 F.3d at 796, or that the allegedly fraudulent acts were "performed for the very purpose of having their consequences felt in [Missouri]," *Dakota Indus.*, 946 F.2d at 1391, personal jurisdiction is evaluated "not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto," with CMI, as the plaintiff, bearing the burden. *Wells Dairy*, 607 F.3d at 518. Despite this litigation having proceeded for nearly five years, CMI has provided no such affidavits or exhibits. Nor has it requested jurisdictional discovery.

CMI attempts to rely on several factually inapposite cases to establish the Court's personal jurisdiction over the Illinois Defendants. CMI most heavily relies on a case from this district—*CitiMortgage, Inc. v. Chicago Bancorp., Inc.*, 2013 U.S. Dist. LEXIS 92414 (E.D. Mo. July 2, 2013).[6] CMI characterizes *Chicago Bancorp* as finding personal jurisdiction over non-resident owners of a defendant mortgage bank who transferred to themselves millions of dollars of their bank's assets and left their bank unable to pay CMI's repurchase claims. [Doc. No. 179 at 1–2].

However, the facts of *Chicago Bancorp* are clearly distinguishable. There, as here, CMI sought to amend its complaint by adding as defendants the non-resident recipients of the allegedly fraudulent transfers. However, in *Chicago Bancorp*, CMI alleged that the defendant

---

[6] CMI incorrectly labels *Chicago Bancorp* as "controlling authority." [Doc. No. 185 at 1]. While not controlling, the Court does view cases from this district as heavily persuasive.

bank "became insolvent, or nearly so, by fraudulently transferring its assets to other entities," and that the defendant bank "effected these transfers so it would not have to pay any judgement rendered against it in *this case*." *Chicago Bancorp., Inc.*, 2013 U.S. Dist. LEXIS 92414, at *1 (emphasis added). The key distinguishing fact was that the allegedly fraudulent transfers in *Chicago Bancorp* occurred *after* the initiation of the lawsuit in this district, and CMI alleged that the transfers "were effected for the purpose of rendering [the defendant bank] judgment-proof in *this case*." *Id.* at *14 (emphasis added); *see also id.* ("Taking CMI's factual allegations as true, the transfers were expressly aimed at defrauding CMI—a Missouri citizen—and specifically intended to undermine *this lawsuit*.") (emphasis added).

The lawsuit in *Chicago Bancorp* was filed in February of 2012, the allegedly fraudulent transfers took place "during the second half of 2012 and the first quarter of 2013,"[7] and the dissolution took place between August of 2012 and January 4, 2013.[8] By contrast, here, CMI alleges that 1st Advantage and DKMC entered into the APA in February of 2008 (approximately seven months before CMI made its first repurchase/cure demand), and approximately two and a half years before CMI initiated this lawsuit. Further, CMI alleges that 1st Advantage was dissolved in August 2010 (approximately a month before CMI filed this lawsuit. For these reasons, the facts giving rise to personal jurisdiction in *Chicago Bancorp*—namely, the alleged fraudulent attempts of the transferees to undermine the ability of a defendant to pay a potential judgment in an ongoing case in Missouri—are absent here.[9]

---

[7] *Chicago Bancorp*, No. 4:12CV246 CDP (E.D. Mo. July 2, 2013), First Amended Complaint, (ECF No. 150 at ¶ 36).

[8] *Id.* at ¶ 37.

[9] The Court notes that *Chicago Bancorp* stated in one instance: "CMI alleges that the asset transfers occurred after Chicago Bancorp had been *threatened* with suit . . . ." 2013 U.S. Dist. LEXIS 92414, at *14. However, this Court's review of the docket in *Chicago Bancorp*, particularly the First Amended Complaint, makes clear that the allegedly fraudulent transfers transpired while the case was proceeding.

CMI relies upon inapposite case law to support its contention that "several lower federal courts have found that a fraudulent transfer of assets under the Uniform Fraudulent Transfer Act was sufficient to satisfy Due Process when the effects of the fraud were felt within the forum state." [Doc. No. 179 at 10]. One of the cited cases involved a multitude of contacts with the forum state,[10] and all but one of the other cases involved defendants allegedly fraudulently transferring assets to prevent plaintiffs from collecting a pre-existing judgment, thus demonstrating that the plaintiffs were the express targets of the defendants' acts.[11] The Court finds the additional cases the Illinois Defendants cited to be on point and persuasive. *See Allen & Vellone, P.C. v. Pino*, 2014 WL 1040634 (D. Colo. Mar. 18, 2014) ("[T]he allegation is that Defendants acted with actual intent to hinder, delay or defraud its creditors, including Plaintiffs. Fairly construed, Plaintiffs' allegation is that they—like all other creditors—were negatively affected by Defendant Pino's actions. That is a far cry from the purposeful, targeted actions that were established in *Mullins*."); *AAA Cooper Transp. v. Wes-Pak, Inc.*, 2012 WL 847470 (M.D.Ala. Mar. 13, 2012) ("[T]here is no evidence that AAA Cooper was paid less than other creditors or treated differently than any of Wes-Pak's other creditors.").

Based on the Court's application of the *Calder* effects test, the third *Land–O–Nod* factor weighs in favor of the Illinois Defendants.

---

[10] *Mullins v. Testamerica, Inc.*, 564 F.3d 386 (5th Cir. 2009) ("Sagaponack allegedly thwarted Faraway's right to payment from TestAmerica as provided under contracts governing the sale of METCO, a *Texas* company, that were executed by Faraway in *Texas*, where Faraway resides. Additionally, the Note and Purchase Agreement are expressly governed by *Texas* law. Thus, the debtor-creditor relationship between TestAmerica and Faraway is centered in *Texas*. Utilizing its veto authority over the HIG transaction, and with full awareness of the Note, Sagaponack purposefully aimed its conduct at Faraway in *Texas* by ensuring that a portion of its own notes would be paid while knowing that Faraway's would not. It is therefore no "mere fortuity" that Sagaponack's conduct would cause injury to Faraway in *Texas*. Under these circumstances, we find that Sagaponack should reasonably have anticipated being haled into a *Texas* court for precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in *Texas* whose right to payment arises out of contracts that share a strong connection with *Texas*.") (emphasis added) (internal citations omitted).

[11] *Cf. Dontos v. Vendomation NZA Ltd.*, 2014 WL 4562853, at *8–9 (5th Cir. Sept. 16, 2014); *State Farm Mut. Auto. Ins. Co. v. Tz'doko V'CHESED of Klausenberg*, 543 F.Supp.2d 424, 430–31 (E.D. Pa. 2008), *with, Dehmlow v. Austin Fireworks, Inc.*, 1996 WL 41494, at *4 (N.D. Ill. Feb. 1, 1996).

### 4. Missouri's Interest in Providing a Forum for its Residents and the Convenience of the Parties

Before the Court considers the final two *Land–O–Nod* factors, it is important to recognize that they cannot outweigh the first three factors. *See Land–O–Nod*, 708 F.2d at 1340 ("For instance, the last two factors are said to be of secondary importance and not determinative.") Even if the Court were to assume the interest of Missouri in litigating this matter weighed in favor of CMI—a fact conceded by the Illinois Defendants—the fifth factor, the convenience of the parties, must weigh in favor of the Illinois Defendants, all of whom are residents of Chicago. The Court therefore concludes that though the fourth *Land–O–Nod* factor weighs in favor of CMI, and the fifth *Land-O–Nod* factor weighs in favor of the Illinois Defendants, Missouri's "interest in providing its residents with a forum cannot make up for the absence of minimum contacts." *Digi-Tel Holdings v. Proteq Telcoms.*, 89 F.3d 519, 525 (8th Cir. 1996).

### 5. Due Process Conclusion

For the reasons explained, the Court finds that CMI has failed to allege the minimum contacts with Missouri necessary to comport with the Due Process Clause as it relates to CMI's claims against the Illinois Defendants. Although the personal jurisdiction analysis incorporates both a due process inquiry and a long-arm statute inquiry, given that the Missouri long-arm statute authorizes personal jurisdiction to the extent permissible under the Due Process Clause, a finding that a plaintiff has *failed* to establish that personal jurisdiction comports with the Due Process Clause is dispositive in Missouri cases, thus obviating the necessity of a long-arm inquiry. *See Eagle Tech., Inc. v. Expander Ams., Inc.*, 2015 U.S. App. LEXIS 6718, at *9 (8th Cir. Apr. 22, 2015) ("Because 'the Missouri long-arm statute authorizes the exercise of jurisdiction over non-residents to the extent permissible under the due process clause, we turn immediately to the question whether the assertion of personal jurisdiction would violate the due process clause.'") (quoting *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004)); *see also*

*Viasystems*, 646 F.3d at 594 ("We need not decide whether these actions by St. Georgen suffice to place it within the bounds of Missouri's long-arm statute, because it is clear that the cited activities are not sufficient to surmount the due-process threshold.").[12] Accordingly, based on the Court's due process analysis, it finds that it does not have personal jurisdiction over the Illinois Defendants arising from their alleged acts.

**B.     Alter Ego**

CMI alternatively asserts that the Court's personal jurisdiction over 1st Advantage can be imputed to the Illinois Defendants on the theory that 1st Advantage was the alter ego of the Illinois Defendants following the closing of the APA transaction. The Illinois Defendants' only response to this assertion is that there is "no mention of the term 'alter ego' anywhere in [CMI's] pleadings, let alone a separate count stating the predicate allegations to support this desperate theory," and that CMI's "failure to plead this theory is reason enough to reject this last second 'hail Mary.'" [Doc. No. 181 at 13]. The Court finds that, despite CMI not using the technical term "alter ego"—or, for that matter, "pierce the corporate veil"—in its Third Amended Complaint, CMI effectively pled these allegations in the complaint, and the allegations are sufficient for the Court to exercise personal jurisdiction over the Illinois Defendants on the basis of imputing to the Illinois Defendants 1st Advantage's agreement in its contracts with CMI to litigate claims in this district.

"It is well established that in diversity cases a federal district court must apply the law of the forum state to determine the persons over whom it may assert *in personam* jurisdiction." *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 637 (8th Cir. 1975). In that respect, the Court looks to Missouri law "to determine whether and how

---

[12] By contrast, a court's finding that it *does* have personal jurisdiction over a non-resident defendant requires analysis of *both* the long-arm statute and the Due Process Clause. *See Myers*, 689 F.3d at 909–910 (citing *Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 231 (Mo. banc 2010)).

to pierce the corporate veil." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003) (citing *id.*).

"Piercing the corporate veil is an equitable doctrine used by the courts to look past the corporate form and impose liability upon owners of the corporation—be they individuals or other corporations—when the owners create or use the corporate form to accomplish a fraud, injustice, or some unlawful purpose. *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014); *see also Mobius Mgmt. Sys. v. W. Physician Search*, L.L.C., 175 S.W.3d 186, 188 (Mo. Ct. App. 2005) (noting that in order to pierce the corporate veil, "the plaintiff must show that the corporation is the alter ego of the defendant."). The Missouri Supreme Court has explained:

> [C]orporate forms will be ignored and the corporate veil pierced only if three factors are shown:
>
> 1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> 2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> 3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*Doe v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. banc 2013) (citing *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. banc 1999)).

The Third Amended Complaint brings one claim (Count I) against 1st Advantage for breach of contract related to selling CMI defective loans that did not conform to the terms of their agreements, and failing to repurchase or cure the nonconforming loans. CMI asserts that this Court has personal jurisdiction over 1st Advantage both because 1st Advantage agreed in its contracts with CMI to litigate all claims related to the mortgages in this district, and because 1st

Advantage conducted business in Missouri by selling and delivering loans to CMI. Neither of these grounds has been challenged by CMI.

The Third Amended Complaint brings two claims against the Illinois Defendants, both asserting that they are personally under the Illinois Limited Liability Company Act (Count II) and the Missouri Uniform Fraudulent Transfers Act (Count III) for any judgment for breach of contract in Count I against 1st Advantage based on the manner in which 1st Advantage was dissolved and its assets were distributed. CMI alleges that the Illinois Defendants were the owners of 1st Advantage; that the Illinois Defendants maintained 1st Advantage as a shell company for the purpose of making the distributions of payments from DKMC to themselves; that 1st Advantage, acting at the direction of the Illinois Defendants, transferred all of the payments from DKMC for its business to the Illinois Defendants; that Defendant Lueken, without following proper legal procedure, improperly dissolved 1st Advantage; and that CMI was proximately injured by these actions.

Although CMI does not use the technical terms "alter ego" or "pierce the corporate veil" in its Third Amended Complaint, it has effectively pled facts to establish the requisite three factors for these legal theories. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (noting, in the Rule 12(b)(6) context, that "[f]ederal pleading rules call for a short and plain statement of the claim showing that the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (internal citation and quotation marks omitted). Indeed, the entire basis for CMI's request for relief against the Illinois Defendants is that they are personally liable for any judgment against 1st Advantage for its alleged breaches of contract.[13]

---

[13] The Court does not definitively find that CMI has successfully pierced the corporate veil and established that 1st Advantage was the Illinois Defendants' alter ego, but rather finds that—in viewing the evidence in the light most favorable to CMI and resolving all factual conflicts in its

There is ample authority for the proposition that a corporation's consent to a forum selection clause may be imputed to its owners for purposes of personal jurisdiction when the corporate veil is pierced. *See, e.g.*, *Brainware, Inc. v. Scan-Optics, Ltd.*, 2012 U.S. Dist. LEXIS 77337 (E.D. Va. May 9, 2012); *Hale Propeller, L.L.C. v. Ryan Marine Prods. PTY., LTD.*, 98 F. Supp. 2d 260, 264–65 (D. Conn. 2000); *Packer v. TDI Sys.*, 959 F. Supp. 192, 201–03 (S.D.N.Y. 1997); *Mi-Jack Products, Inc. v. The Taylor Group, Inc.*, 1997 U.S. Dist. LEXIS 11439 (N.D. Ill. 1997); *Totalplan Corp. of Am. v. Lure Camera, Ltd.*, 613 F. Supp. 451, 458 (W.D.N.Y. 1985).

Accordingly, although CMI has failed to adequately allege personal jurisdiction over the Illinois Defendants based on their own acts, exclusively, the Court finds that CMI has alleged sufficient facts to demonstrate a reasonable inference that the Court may impute its personal jurisdiction over 1st Advantage to the Illinois Defendants through an alter ego theory.

### Conclusion

Based on the foregoing, the Court denies the Illinois Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.

Accordingly,

**IT IS HEREBY ORDERED** that the Illinois Defendants' Motion to Dismiss [Doc. No. 175] is **DENIED**.

Dated this 27th day of April, 2015.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

---

favor—CMI has made a minimal prima facie showing that the corporate veil should be pierced for purposes of personal jurisdiction. *K-V Pharm*, 648 F.3d at 591–92; see also *George v. Davis*, 2015 U.S. Dist. LEXIS 10648 (W.D. Ark. Jan. 28, 2015).